WO

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Angel Mayora Medrano, | ) No. CV-99-603-TUC-CKJ |
| Petitioner, | ) <u>DEATH PENALTY CASE</u> |
| vs. | ) **MEMORANDUM OF DECISION AND ORDER RE: CONVICTION-RELATED CLAIMS** |
| Charles L. Ryan, et al., | ) |
| Respondents. | ) |

Petitioner Angel Mayora Medrano ("Petitioner"), a state prisoner under sentence of death, petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging that he is imprisoned and sentenced in violation of the United States Constitution. Petitioner's sentencing-related claims have been stayed since 2003, pending completion of state post-conviction proceedings based on alleged mental retardation and ineligibility for the death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2002). (Doc. 80.)[1]  This Order addresses Petitioner's remaining conviction-related claims and corresponding requests for evidentiary development.  For the reasons set forth herein, the Court concludes that Petitioner is not entitled to habeas relief or to evidentiary development on any of these claims.

---

[1]     "Doc." refers to the documents in this Court's file.

# FACTUAL AND PROCEDURAL BACKGROUND

Petitioner was convicted and sentenced to death for the murder of Patricia Pedrin. The Arizona Supreme Court summarized the facts as follows:

> On the morning of February 1, 1987, Tucson police were called to investigate the death of a woman whose body was discovered at home by her five-year-old daughter, two-year-old son, and a friend's six-year-old daughter. An autopsy established that she died of multiple stab wounds and was approximately eight weeks pregnant. It further revealed evidence of recent sexual activity.
>
> At the time of the victim's death, her husband was in prison, but he received periodic passes to visit his family. He was also allowed to make phone calls from prison. Several days before February 1, he called defendant (appellant), with whom he was acquainted, and asked him to put new tires on his wife's car. Defendant replaced the tires on January 31. At the time, defendant was serving a federal sentence at a halfway house for substance abusers, but he was permitted to leave the premises to work, and had weekend passes allowing him to stay elsewhere overnight.
>
> Several days after the body was discovered, defendant contacted the investigating detective at the request of the victim's husband and reported that he had recently put tires on her car. Subsequently, the police obtained a court order to take blood and saliva samples from defendant. They also questioned him about the clothing he wore on the night of January 31. Defendant gave them some shirts, trousers, and a pair of boots. One shirt was missing a button similar to that discovered in the victim's home.
>
> When a warrant was obtained for defendant's arrest, officers were unable to find him. He was ultimately located in Juarez, Chihuahua, Mexico. On November 24, 1987, Chihuahua Judicial State Police officers, accompanied by an officer of the El Paso, Texas police department, arrested him. Thereafter, defendant told the Juarez deputy police chief that if he was not injured or beaten, he would tell the truth. He then confessed to forcibly raping the victim and killing her after she threatened to tell her husband about the rape. The El Paso officer was present during this confession. Defendant again confessed to the crimes in a written statement to the Mexican authorities.
>
> Later that day, a Pima County Sheriff's detective took custody of defendant at the international border in El Paso. Defendant confessed twice to the detective, once upon being taken into custody, and a second time following the reading of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). After they returned to Tucson, he confessed again, and this statement was recorded.
>
> Defendant was charged with first degree murder, kidnapping, sexual assault, and burglary. He was convicted following a jury trial, and was sentenced to death for murder and to 21 years' imprisonment on each of the kidnapping, sexual assault, and burglary convictions. The prison sentences were ordered to run concurrently, but consecutively to the death sentence.

*State v. Medrano*, 173 Ariz. 393, 394-95, 844 P.2d 560, 561-62 (1992) (*Medrano I*).

While Petitioner's direct appeal was pending, he filed a post-conviction relief ("PCR") petition, which was denied. Review of that denial was consolidated with Petitioner's direct appeal. On appellate review, the Arizona Supreme Court affirmed Petitioner's convictions, but invalidated one of the two aggravating circumstances found by the trial judge and remanded for resentencing. *Medrano I*, 173 Ariz. at 399, 844 P.2d at 566. Petitioner was resentenced to death, and the Arizona Supreme Court affirmed on appeal. *State v. Medrano*, 185 Ariz. 192, 914 P.2d 225 (1996) (*Medrano II*). Petitioner filed a second PCR petition, which was denied. The Arizona Supreme Court summarily denied a petition for review. Petitioner then commenced these habeas proceedings.

In 2000, Petitioner filed an amended habeas petition raising nineteen claims. (Doc. 30.) Pursuant to the Court's then general procedures governing resolution of capital cases, the parties first briefed the procedural status of each claim. In 2002, following the Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002) (requiring jury determination of factors rendering a defendant capital-eligible), this Court stayed Petitioner's sentencing-related claims while Petitioner sought retroactive application of *Ring* in state PCR proceedings. That stay was extended in 2003 to allow Petitioner to also seek state PCR relief based on *Atkins v. Virginia*. (Doc. 80.) Although more than eight years have passed, the state superior court has yet to hold an evidentiary hearing on Petitioner's *Atkins* claim. According to the most recent status report filed by Petitioner, that hearing is expected to take place in June 2012. (Doc. 175.)

On September 27, 2007, the Court considered the procedural status of Petitioner's conviction-related claims and determined that Claims 1, 2, 4, 14(A)(1)-(A)(5), and 14(B)(2) were properly exhausted and entitled to merits review.[2] (Doc. 119.) The parties have briefed the merits and Petitioner has requested evidentiary development of these claims. (Docs. 131,

---

[2]    Petitioner subsequently withdrew Claims 14(A)(3) and 14(A)(4). (*See* Doc. 131 at 49.)

139, 145.)

**STANDARD FOR HABEAS RELIEF**

Petitioner filed his petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The AEDPA established a "substantially higher threshold for habeas relief" with the "acknowledged purpose of 'reducing delays in the execution of state and federal criminal sentences.'" *Schriro v. Landrigan*, 550 U.S. 465, 473, 475 (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)). The AEDPA's "'highly deferential standard for evaluating state-court rulings' . . . demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy,* 521 U.S. 320, 333 n.7 (1997)).

Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). In conducting review under § 2254(d)(1), this Court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398-99 (2011).

**DISCUSSION**

**I.    Claims 1 and 2**

In Claim 1, Petitioner alleges that his confession in Juarez, Mexico was coerced, and therefore involuntary, and its admission at trial violated his right to due process under the Fourteenth Amendment. (Doc. 30 at 7-8.) Petitioner further argues that this coerced confession tainted his subsequent statements. (*Id.*) In Claim 2, Petitioner alleges that his statements to American authorities were obtained in violation of *Miranda* because he was not notified of his rights when initially transferred to American custody and because during formal questioning he was incapable of waiving his rights due to mental retardation. (*Id.* at

- 4 -

9-10.)[3]

## A. Background

Prior to trial, Petitioner moved to suppress his statements to Mexican law enforcement officials. (ROA at 63, 158.)[4] The trial court held a pretrial voluntariness hearing. (RT 6/9/88; RT 6/21/88.) At the start of trial, the court *sua sponte* held another hearing to determine whether Petitioner's statements to American authorities were involuntary or provided in violation of *Miranda*. (RT 7/12/88.)

*Statements to Mexican Authorities*

Jose Rubalcava, Deputy Chief of the Judicial Police for the City of Juarez, Mexico, testified that he received a request from American officials to locate and arrest Petitioner who was thought to be residing in Juarez and who had been indicted for a murder occurring in Tucson. (RT 6/9/88 at 5-6.) Rubalcava located Petitioner and sent his officers to arrest him. (*Id.* at 6.) Rubalcava testified that his officers arrested Petitioner on November 24, 1987, and brought him to the Juarez police station. (*Id.* at 6-7.) Rubalcava questioned Petitioner in his office. (*Id.* at 7-8.) Detective David Rojas, of the El Paso Police Department, who was the liaison police officer between the El Paso and Juarez police departments, and several of Rubalcava's officers, witnessed the questioning. (*Id.* at 6-8, 25.)

---

[3] In his merits brief Petitioner also asserts that the Mexican police officials should have provided *Miranda* warnings prior to questioning him. (Doc. 131 at 10-11.) Petitioner did not raise this claim in his amended petition or exhaust it in state court. (*See* Doc. 30 at 9-10.) Rule 2(c) of the Rules Governing Section 2254 Cases requires that all grounds for relief be specified in the petition. *See* Rule 2(c), 28 U.S.C. foll. § 2254; *Mayle v. Felix*, 545 U.S. 644, 655-56 (2005). Because Petitioner did not present this claim in his petition, the Court will not now consider it.

[4] "ROA" refers to the four-volume record on appeal from Petitioner's appeal to the Arizona Supreme Court following resentencing (Case No. CR-94-0207-AP). "ROA-PCR" refers to the thirteen-volume record of sequentially-numbered pleadings and minute entries from Petitioner's PCR proceedings. (Case No. CR-99-0247-PC). "RT" refers to the reporter's trial transcripts. The original transcripts and certified copies of the trial, appeal, and PCR records were provided to this Court by the Arizona Supreme Court. (Doc. 38.)

Rubalcava testifed that when he showed Petitioner the documents requesting his arrest for murder in Tucson, Petitioner confessed that he killed the victim. (*Id.* at 11.) During questioning, Petitioner pleaded not to be beaten or hurt and promised Rubalcava that he would tell them what happened. (*Id.*) Rubalcava denied that Petitioner was abused in any way, threatened, or promised anything in exchange for his confession. (*Id.* at 8, 12.) After questioning, Rubalcava placed Petitioner in a holding cell until the Secretary for the Juarez Police Department could document his confession. (*Id.* at 13-14.) Rubalcava had the Secretary document the confession, and then both Petitioner and Rubalcava signed it. (*Id.* at 14-15, 17.) Rubalcava testified that, while documenting the confession, the Secretary explained to Petitioner that he had the right to have a trusted person present with him, including an attorney, if he so chose. (*Id.* at 14-15.) Rubalcava testified that he was not sure whether Petitioner was in custody in Juarez for one, two, or three days before being turned over to United States authorities. (*Id.* at 21.) He further testified that he directed officers to provide Petitioner with food and water. (*Id.*)

El Paso Detective Rojas testified that he was present when Petitioner was arrested and questioned in Juarez. (*Id.* at 27-28.) While at the Juarez jail, he never observed Petitioner being beaten, threatened, or promised anything in return for his statement. (*Id.*) Rojas did not see any bruises or other indication that Petitioner had been physically abused. (*Id.* at 29-30.) However, Rojas did acknowledge Petitioner telling him that he did not want to be beaten by the Juarez police. (*Id.* at 29-31.) Rojas also testified that Petitioner might have been provided with food based on orders from Rubalcava. (*Id.* at 40.)

Petitioner testified that while being questioned by Rubalcava, Juarez Police Officer Francisco Garza kicked his foot and ankle numerous times and punched him in the ribs. (*Id.* at 44, 46, 48.) Petitioner maintained that he confessed to Rubalcava because they were beating him. (*Id.*) Petitioner further claimed that he was threatened with torture and then tortured by Officer Garza for two days. (*Id.* at 51, 57.) Finally, Petitioner testified that the Mexican authorities did not feed him or give him any water while jailed. (*Id.* at 60.)

Officer Garza testified in rebuttal that while Petitioner was in police custody in Juarez, neither he nor anyone else threatened, abused, or hurt Petitioner in any manner. (RT 6/21/88 at 12-13.) Walter Whaley, a Lieutenant at the Tucson Federal Correctional Facility, also testified in rebuttal. He said that on November 25, the day after Petitioner was delivered to American authorities, the Tucson police transported Petitioner to the federal facility for commitment. (*Id.* at 4-5.) Whaley testified that Petitioner was strip-searched before being admitted and that there were no observable marks or bruises on his body. (*Id.* at 5-7.) Further, Petitioner did not complain or mention any bruises, kicking, scratching, or anything of that sort. (*Id.* at 8.)

During closing argument, defense counsel asserted that the Mexican police officials had a reputation for brutality toward prisoners and in support submitted newspaper articles in which American citizens had been arrested and brutalized by the Juarez police. (*Id.* at 19-20.) At conclusion of the hearing, the trial court denied the suppression motion, finding the testimony of the police officers more credible and concluding that Petitioner's statements to the Juarez police officers were voluntary and not the result of duress, torture, or threats of torture. (*Id.* at 20-22.)

*Statements to American Authorities*

After making his statement to Mexican police on November 24, Petitioner confessed a second and third time that same day to American officials. He confessed again early the next day to a Tucson police officer.

At the El Paso Immigration Office, Petitioner was turned over to Detective John Patze of the Pima County Sheriff's Office and Lois Engstrand of the United States Marshal's Service. (RT 7/12/88 at 9.) Patze informed Petitioner that he was under arrest pursuant to a federal warrant and that he was going to be charged with first-degree murder after he was returned to Tucson. Petitioner then stated,"I did it, I done it, not a day goes by that I don't think about it." (*Id.* at 10.) Patze advised Petitioner that they would discuss the matter fully when they later arrived at the U.S. Marshal's Office in El Paso. (*Id.* at 10.)

At the Marshal's Office, Patze read Petitioner his *Miranda* rights from a departmental card, and Petitioner responded that he understood his rights and agreed to speak with the officers. (*Id.* at 11-12.) Petitioner never communicated any trouble or difficulty understanding the questions and responded appropriately to each. (*Id.* at 13.) Detective Patze testified that during the interrogation he did not make Petitioner any promises and did not threaten or physically abuse him to get him to answer questions. (*Id.* at 12-13.)

During the interrogation Petitioner acknowledged going over to the victim's house late at night and said she had let him in and they talked for a little while. (*Id.* at 180-81.) He was vague about whether he had sex with the victim, but said at one point he looked down and saw that his hands were covered with blood and that he had a knife in his hand. (*Id.* at 181-82.) Petitioner did not provide any further details of the murder but did say he left her laying on her back on the bed. (*Id.* 182-84.) He also said, "[I]n my conscience, I know I killed her, but in my heart, I didn't." (*Id.* at 185.) At some point, Petitioner indicated to Patze that he would be willing to speak with Tucson Police Sergeant Sexto Molina, who knew Petitioner and other members of Petitioner's family. (*Id.* at 13, 17-18.)

In the early morning hours of November 25, shortly after Petitioner's return to Tucson, Sergeant Molina interrogated Petitioner. Patze and Engstrand had previously informed Molina that Petitioner had been advised of his *Miranda* rights and had agreed to speak with Molina regarding the murder. (RT 7/13/88 at 11-12.) Sergeant Molina taped the conversation but did not re-advise Petitioner of his *Miranda* rights. (RT 7/12/88 at 16, 20.) During the interrogation, Petitioner did not invoke his right to an attorney or indicate that he was having difficulty understanding the questions. (*Id.* at 18.) Petitioner confessed to Molina that he had sex with the victim before he stabbed her and that he didn't know she was pregnant. (Doc. 172-1 at 11.) Sergeant Molina testified that during the interrogation, he made no promises and never threatened or physically abused Petitioner. (RT 7/12/88 at 18.)

Following the completion of testimony, the trial court concluded that Petitioner's initial statement to Detective Patze was voluntary and not the result of police interrogation.

(RT 7/12/88 at 23.)  The court further concluded that Petitioner's statements at the Marshal's office and to Sergeant Molina were made after Petitioner was read his *Miranda* rights, understood those rights, and voluntarily agreed to speak with the officers. (*Id.*)  The Court further found that the statements were not made as a result of any threats, coercion, or promises.  (*Id.*)

## B.    Voluntariness

In evaluating the voluntariness of a confession, "the test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *Derrick v. Peterson*, 924 F.2d 813, 817 (9th Cir. 1990) (citing *Haynes v. Washington*, 373 U.S. 503, 513-14 (1963)).   Coercive police activity, including lengthy questioning, deprivation of food or sleep, physical threats of harm, and psychological persuasion, is a necessary predicate to a finding that a confession is not voluntary within the meaning of the Due Process Clause. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).  Therefore, personal characteristics of the suspect, such as age and mental capacity, are "constitutionally irrelevant absent proof of coercion." *Derrick*, 924 F.2d at 818.

*Statement to Mexican Authorities*

On appeal, the Arizona Supreme Court affirmed the trial court's determination that Petitioner's confession to Mexican authorities was voluntary:

> Prior to trial, defendant moved to suppress the statements he made in Mexico.  At a hearing in the trial court, the deputy chief of police from Juarez, a Mexican police officer, the El Paso police officer, and defendant all testified. Defendant claimed he gave his statements to the Mexican officers "[b]ecause they were beating me."  He also said his written statement was taken two or three days after he was picked up by Mexican authorities, rather than on the same day, and that he was deprived of food and water during his detention. The witnesses disputed this.  They testified that no promises or threats were made to encourage defendant to talk and no verbal or physical abuse was used against him.
>
> A corrections officer who processed defendant in Tucson on November 25 testified that he observed no marks, scratches, or bruises consistent with defendant's claim of having been physically abused.  He said defendant's only physical complaints were a sore throat and ear discomfort.  Moreover, a Department of Corrections document, completed during a strip search,

indicated no marks or bruises on defendant.

> The trial court's determination that the statements were freely and voluntarily made will not be disturbed on appeal in the absence of clear and manifest error. *State v. Hall*, 120 Ariz. 454, 456, 586 P.2d 1266, 1268 (1978). The court here determined that the police officers' testimony was consistent and credible, and that the Juarez confession was voluntary and not the result of duress, threats, or torture. We have searched the record and discovered nothing that would cause us to alter this finding, despite defendant's claim of physical abuse, torture, and the alleged reputation of the Juarez police for beating prisoners.

> Because confessions are prima facie involuntary, the court's finding must be supported by a preponderance of the evidence. *State v. Thomas*, 148 Ariz. 225, 227, 714 P.2d 395, 397 (1986). There was more than enough evidence in this case. The trial court properly denied the motion to suppress.

*Medrano I*, 173 Ariz. at 395-96, 844 P.2d at 562-63.

Petitioner argues that the state court's factual findings from the voluntariness hearing were objectively unreasonable. *See* 28 U.S.C. § 2254(d)(2). Specifically, he asserts it was unreasonable to find he was not deprived of food and water when no government witness testified they saw him being fed while jailed in Juarez. (*Id.*) He further argues the state court ignored the Juarez police force's reputation for physical abuse and the testimony of El Paso Detective Rojas, who acknowledged that Petitioner had pleaded during questioning not to be hurt. (*Id.*) Finally, he challenges the Arizona Supreme Court's failure to acknowledge inconsistent testimony regarding the length of time he was jailed in Juarez and his claim of being held incommunicado. (*Id.*)

Petitioner alleges that he did not receive food or water while jailed in Juarez. Deputy Chief Rubalcava testified that he ordered his men to provide food and water to Petitioner. (RT 6/9/88 at 21.) Petitioner testified that he did not receive food or water. (*Id.* at 60.) The evidence on this point was conflicting, and the trial court credited the testimony of Rubalcava. (RT 6/21/88 at 21-22.) There is nothing in the record to suggest that the trial court's crediting of Rubalcava's testimony was objectively unreasonable. The Arizona Supreme Court adopted the trial court's findings. *Medrano I*, 173 Ariz. at 396, 844 P.2d at 563. A state court's credibility determinations are entitled to great deference. *See Rice v. Collins*, 546 U.S. 333, 341-42 (2006) ("Reasonable minds reviewing the record might

disagree about [a witness's] credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination."); *see also Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) ("28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."). Based on the record before the state court, this Court finds it was not objectively unreasonable for the state court to find that Petitioner had not been deprived of food or water while incarcerated in Juarez.

Similarly, it was not objectively unreasonable for the state court to determine that Petitioner had not been beaten and abused at the Juarez jail over a two-day period. The state court heard from Juarez and El Paso police officials Rubalcava, Garza, and Rojas, each of whom had dealings with Petitioner when he was arrested, questioned, and jailed pending release to American officials. (RT 6/9/88 at 8-12, 27-42; RT 6/21/88 at 11-15.) Each testified that Petitioner was not physically abused or threatened with abuse while incarcerated in Juarez. (*Id.*) Petitioner testified that he was beaten and physically abused over a two-day period. (RT 6/9/88 at 44-59.) Rubalcava testified that he was not sure whether Petitioner was jailed for one, two, or three days. However, he also stated that Petitioner was arrested on November 24. (*Id.* at 5-6.) Detective Patze testified that he obtained custody of Petitioner on November 24 and transported him to Tucson late that same day. (RT 7/12/88 at 9-10.) Lieutenant Whaley at the Tucson Correctional Facility testified that he processed Petitioner into the federal facility on November 25. (RT 6/21/88 at 4-10.) In addition, Whaley testified that Petitioner was thoroughly examined during processing and did not show any signs of having been abused. (*Id.*) The trial judge who observed the witnesses expressly found the officers' testimony more credible than that of Petitioner. This Court cannot say that the state court's credibility determination was objectively unreasonable.

Based on the factual record before it, the Arizona Supreme Court concluded that Petitioner's confession was voluntary. *Medrano I*, 173 Ariz. at 396, 844 P.2d at 563. This Court has reviewed the record underlying the factual determinations made by the state court

and concludes they were not objectively unreasonable. Therefore, Petitioner is precluded from habeas relief under § 2254(d)(2).

With regard to § 2254(d)(1), Petitioner argues that the state court's voluntariness ruling was contrary to *Reck v. Pate*, 367 U.S. 433 (1961), because the court failed to discuss and apply *Reck* as controlling federal precedent.[5] However, the state court was under no requirement to discuss or to even cite specific Supreme Court precedent in its rationale denying the claim. *See Early v. Packer*, 537 U.S. 3, 8 (2002) (holding that state court need not cite or even be aware of pertinent Supreme Court precedent so long as ruling does not contradict such precedent). Moreover, the state court utilized the proper legal standard, even though it did not cite to any federal caselaw. Specifically, the court found the Juarez statement to be voluntary and "not the result of duress, threats, or torture." *Medrano I*, 173 Ariz. at 395-96, 844 P.2d at 562-63.

Petitioner further contends that the state court failed to give his allegation of mental retardation sufficient weight in determining whether his confession was voluntary. However, the personal characteristics of a defendant, including mental capacity, are constitutionally irrelevant absent proof of coercive police conduct. *See Connelly*, 479 U.S. at 164; *Derrick*, 924 F.2d at 818. Because the state court reasonably concluded that Petitioner's confession was not coerced by the Mexican police, Petitioner's mental status was irrelevant in determining voluntariness under the Due Process Clause.

In sum, Petitioner has not established that the state court's rejection of his voluntariness claim with regard to the Juarez confession was contrary to controlling federal law or based on an objectively unreasonable determination of fact or application of law.

---

[5]　In *Reck*, the Court found involuntary a confession by a 19-year-old with subnormal intelligence, who was relentlessly interrogated daily for over a week without adequate food, without counsel, without access to friends and family, and while in serious pain, having to be taken twice to the hospital during the interrogation period. 367 U.S. at 441-42. Relying on *Reck*, Petitioner argues that his confession was similarly involuntary due to mental retardation, being beaten and held by the police incommunicado for two days, and being deprived of food and water. (Doc. 131 at 3-10.)

*Statements to American Authorities*

On appeal, the Arizona Supreme Court agreed with the trial court's findings that Petitioner's subsequent confessions to American law enforcement officers were not given as a result of any threats, coercion, or promises. *Medrano I*, 173 Ariz. at 396, 844 P.2d at 563. The court further agreed that Petitioner's subsequent confessions were voluntary and properly admitted at trial. (*Id.*)

Petitioner's contention regarding the reasonableness of this state court ruling hinges on the argument that his statements to the Mexican police were coerced and involuntary, thus tainting his subsequent confessions. (Doc. 131 at 3.) The Court has already determined that the state court's voluntariness determination as to the Juarez confession was not objectively unreasonable. In light of this finding, Petitioner's "taint" argument is plainly meritless.

## C. *Miranda* Violation

In *Miranda v. Arizona*, the Supreme Court held that before police may subject a criminal suspect to custodial interrogation the individual "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. 436, 444 (1966). These rights are a series of "procedural safeguards" designed "to insure that the right against compulsory self-incrimination [is] protected." *Michigan v. Tucker*, 417 U.S. 433, 444 (1974).

*Statement Before Miranda Warnings*

After being transferred to the custody of American officials and told he would be charged with murder when returned to Tucson, Petitioner responded: "I did it, I done it, not a day goes by that I do not think about it." (RT 7/12/88 at 9-10.) Petitioner contends this statement should have been suppressed because it was obtained without first providing him with *Miranda* warnings. (Doc. 30 at 9-10.) The state court concluded that Petitioner's confession was not in response to interrogation and therefore the admission of the confession at trial did not violate *Miranda*. *Medrano I*, 173 Ariz. at 396, 844 P.2d at 63. This Court

agrees.

*Miranda* does not require suppression of voluntary statements made by a defendant in custody if such statements are not the product of interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 297 (1980). The term "interrogation" refers both to direct questioning and its "functional equivalent"—"words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 229-301. Whether conduct is the functional equivalent of direct questioning is determined using an objective test. *United States v. Moreno-Flores*, 33 F.3d 1164, 1169 (9th Cir. 1994). The focus is on the "defendant's perceptions." *Id.* The officers' subjective intent is relevant but not dispositive. *Id.* Informing a defendant about the charges or the evidence against him is attendant to arrest and custody, and is not deemed "interrogation." *Id.* at 1168-69 (citation omitted). Even if an officer's statements "may have struck a responsive chord, or . . . constituted 'subtle compulsion,'" this is not enough to deem them the functional equivalent of interrogation. *Id.* at 1169-70; *see, e.g.*, *Kemp v. Ryan*, 638 F.3d 1245, 1255-56 (9th Cir. 2011) (holding that officer's question about suspect's custody status not interrogation).

In this case, there was no interrogation because Petitioner's statement was made in response to the officers informing Petitioner that he was under arrest pursuant to a federal warrant and would be charged with murder upon his return to Tucson. Because informing a defendant about charges or potential charges is attendant to arrest and custody and is not interrogation, there was no need for the officers to first provide *Miranda* warnings. *See Moreno-Flores*, 33 F.3d at 1169. The Arizona Supreme Court's conclusion that Petitioner's "I did it" statement was not made as the result of interrogation was not contrary to or based on an unreasonable application of federal law.

*Statements After Miranda Warnings*

Detective Patze read *Miranda* warnings to Petitioner after they arrived at the U.S. Marshal's office in El Paso. Petitioner then answered questions about the murder and made

several incriminating statements. Hours later, after being transported to Tucson, Petitioner was questioned by Tucson police and made additional incriminating statements. Petitioner argues that admission of these statements at trial violated his Fifth Amendment right against self incrimination because he did not knowingly and intelligently waive his rights due to his alleged mental retardation.

A defendant may "knowingly and intelligently waive[] his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda*, 384 U.S. at 475. To constitute a "knowing and intelligent" waiver, the suspect must have understood both the nature of the right being waived and the consequences of the decision to abandon it. *Colorado v. Spring*, 479 U.S. 564, 573-74 (1987) (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). The relevant question is not whether the suspect knew and understood "every possible consequence" of a Fifth Amendment waiver but whether he knew that he could "choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Id.* Although the personal characteristics of a suspect are irrelevant to a voluntariness analysis absent proof of police coercion, *Connelly*, 479 U.S. at 167, a suspect's mental capacity is one of many factors to be considered in the "totality of the circumstances" analysis regarding whether a *Miranda* waiver was knowing and intelligent. *See Garner v. Mitchell*, 557 F.3d 257, 264-65 (6th Cir. 2009) (en banc) (noting that totality of the circumstances includes a suspect's background, experience, and conduct) (citing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).

In this case, the Arizona Supreme Court considered Petitioner's alleged mental retardation in determining that Petitioner's waiver of *Miranda* rights was valid:

> Defendant makes several arguments relating to his mental condition. His intelligence quotient (IQ) was apparently last measured and recorded as being 75 when he was 15 years old. He is now 36. He claims that his low IQ renders him "mentally retarded" and more prone to suggestion than a person of average intelligence. He argues, therefore, that his confessions were involuntary and his waiver of *Miranda* rights invalid. . . .
>
> Defendant's argument that his low IQ invalidated the confessions is without substance. Although below average, an IQ of 75 is higher than that generally thought to be evidence of mental retardation. *See Penry v. Lynaugh*,

- 15 -

492 U.S. 302, 308 n. 1, 109 S.Ct. 2934, 2941 n. 1 (1989).  At worst, it may be considered borderline.  *See State v. Bishop*, 162 Ariz. 103, 104, 781 P.2d 581, 582 (1989).  Defendant, however, functioned adequately in society for many years prior to his confessions, although he had some problems with drug abuse. He attended high school for three years and worked in his father's tire store as both a laborer and a salesman.  There is no showing here that defendant's intelligence was so compromised that his statements should be deemed involuntary.

*Medrano I*, 173 Ariz. at 396, 844 P.2d at 63.

Petitioner does not address the reasonableness of this ruling in his merits brief.  In his reply brief, with regard to a related ineffectiveness claim discussed next, Petitioner asserts summarily that the Arizona Supreme Court unreasonably determined the facts by improperly discounting the 20-year-old IQ test.  (Doc. 145 at 13.)  Having reviewed the record that was before the state court at the time, this Court concludes that the state court's ruling is based on neither an unreasonable determination of fact nor application of controlling law.

In *Derrick v. Peterson*, a pre-AEDPA case, the Ninth Circuit considered whether the defendant's mental limitations rendered his *Miranda* waiver invalid.  At the time of his arrest, Derrick was 16 years old and had an IQ between 62 and 74.  924 F.2d at 815-17.  The police read him his rights at least four times, and he signed a written waiver.  *Id.* at 824.  Derrick had a history of prior arrests and experience with the police, which the court found suggested he understood the nature of a *Miranda* waiver.  *Id.*  Derrick's own psychologists also testified that Derrick could understand the concepts that the *Miranda* warnings are meant to convey, although they also believed he could not understand all of the possible consequences flowing from a waiver.  *Id.*  Observing that lack of foresight has never vitiated a *Miranda* waiver, the Ninth Circuit upheld the state court's determination that Derrick had knowingly and intelligently waived his rights.  *Id.* (citing *Oregon v. Elstad*, 470 U.S. 298, 316 (1985)).

The facts here are similar.  Although Petitioner did not sign a written waiver of rights, he orally acknowledged that he understood the warnings and was willing to answer questions.  Petitioner, in his early thirties, had a history of prior arrests and was serving a federal sentence when the crime occurred.  As in *Derrick*, such prior arrests and experience

with the police and criminal justice system suggest that Petitioner understood the nature of his *Miranda* rights. Although Petitioner did not present psychological evidence at the suppression hearing, he raised the mental retardation issue in his first PCR petition and appended school records indicating a full-scale IQ score of 75. (ROA-PCR at 71.) The Arizona Supreme Court considered the newly-developed information regarding Petitioner's intelligence level, but concluded that Petitioner's background, education, work history, and the circumstances surrounding the confessions showed his intelligence was not so compromised that the waiver of *Miranda* rights was invalid. *Medrano I*, 173 Ariz. at 396, 844 P.2d at 563. Nothing in the record suggests that Petitioner did not understand the *Miranda* warnings. Based on the facts that were before the state court, it was not objectively unreasonable for the Arizona Supreme Court to find that Petitioner's *Miranda* waiver was valid in light of the totality of the circumstances.

### D.    Evidentiary Development

Petitioner seeks discovery, an evidentiary hearing, and expansion of the state court record to show that Mexican police have repeatedly tortured others to confess and that Petitioner is mentally retarded. However, in assessing whether a petitioner has satisfied AEDPA's threshold for relief for a claim adjudicated on the merits in state court, a federal court's review of the claim is limited to the record that was before the state court. *See Cullen v. Pinholster*, 131 S. Ct. at 1398 (limiting review under § 2254(d)(1) to the state court record); 28 U.S.C. § 2254(d)(2) (precluding habeas relief unless state court decision based on unreasonable determination of fact "in light of the evidence presented in the State court proceeding").

Here, the Court has found for Claims 1 and 2 that Petitioner failed to satisfy either prong of § 2254(d) in light of the evidence before the state court. Therefore, federal evidentiary development in support of these claims is unwarranted, and the requests are denied. *See, e.g.*, *Kemp v. Ryan*, 638 F.3d at 1260 (observing that discovery would be futile if petitioner not entitled to an evidentiary hearing).

## II.  Claim 14(A)(2)

In his amended petition, Petitioner asserts summarily that trial counsel "did not understand the legal test for voluntariness and further failed to challenge all the confessions." (Doc. 30 at 32.)  In his merits brief, Petitioner states that this ineffectiveness claim is "subsumed by Claim One." (Doc. 131 at 49.)  However, Petitioner fails to address the merits of the ineffectiveness claim within the discussion of Claim 1 other than to note that counsel "failed to develop the claim that Petitioner's mental retardation rendered his waiver of the right to remain silent 'unknowing.'"  (*Id.* at 4.)  This specific allegation was raised in Petitioner's first PCR petition (*see* ROA-PCR at 59) and denied by the Arizona Supreme Court:

> Similarly, we reject the ineffective assistance claim as it relates to the admissibility of defendant's inculpatory statements.  Though no evidence on this issue was taken because the trial court erroneously ruled that the question could be raised on direct appeal and therefore was precluded, *State v. Valdez*, 160 Ariz. 9, 15, 770 P.2d 313, 319 (1989), we are able to "clearly determine from the record that the ineffective assistance claim is meritless."  *State v. Carver*, 160 Ariz. 167, 175, 771 P.2d 1382, 1390 (1989).  Given defendant's background, education and work history, and the circumstances surrounding his repeated confessions, counsel's failure to offer a below-average IQ measured almost two decades earlier does not present a colorable claim of ineffective assistance nor is it likely to have affected the outcome of this case. *State v. Borbon*, 146 Ariz. 392, 398, 706 P.2d 718, 724 (1985).

*Medrano I*, 173 Ariz. at 396, 844 P.2d at 563.  Thus, this claim was adjudicated on the merits in state court.

To establish an ineffectiveness claim, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  Under the AEDPA, this Court's review of the state court's decision is subject to another level of deference. *Bell v. Cone*, 535 U.S. 685, 698-99 (2002).  Petitioner must make the additional showing that the state court's ruling was based on an unreasonable application of *Strickland* or an unreasonable determination of fact.  28 U.S.C. § 2254(d).

Petitioner's only argument with respect to the state court's ruling is that the Arizona Supreme Court unreasonably determined the facts by discounting the significance of the 20-

year-old IQ test. The Court disagrees. Nothing in the state court's decision indicates that it rejected as fact that Petitioner had a below average intelligence. Indeed, in determining that Petitioner's *Miranda* waiver was valid, the court considered the totality of the circumstances surrounding Petitioner's confessions, including the fact that Petitioner had a low IQ but nonetheless functioned adequately for many years prior to the confessions, attended three years of high school, and had a work history as both a laborer and salesman. In addition, Petitioner had prior arrests and was serving a federal sentence at the time of the offense. This Court finds it was not objectively unreasonable for the state court to conclude that evidence of Petitioner's diminished intellect would not have affected admissibility of the confessions had trial counsel presented such evidence at the suppression hearing. Because Petitioner has not satisfied the necessary threshold for habeas relief under 28 U.S.C. § 2254(d), his requests for evidentiary development of this ineffectiveness claim are denied.

**III.** <u>**Claim 4**</u>

Petitioner alleges that the prosecution's failure to disclose notes from a pretrial interview of child witness Londie Lespron violated his right to due process under *Brady v. Maryland*, 373 U.S. 83 (1963). (Doc. 30 at 11.) Petitioner contends the notes establish that others beside himself were at the victim's house the night of the murder and, if properly disclosed, could have been used to assert that someone else may have killed the victim and that his confessions were false. (Doc. 131 at 31-32.)

**A.     Background**

In June 1988, one month before trial, Detective Joseph Godoy and Deputy County Attorney Sandra Hansen interviewed Yolanda Lespron and her six-year-old daughter, Londie. (ROA-PCR at 145-47.) Londie, along with the victim's five-year-old daughter and two-year-old son, were at the victim's home when the murder took place. Londie refused to speak directly with Godoy or Hansen, and instead answered her mother's leading questions. (*Id.* at 146.) In a report, Detective Godoy summarized Londie's responses as follows:

> Baby Alex [victim's son] was laughing. Boy knocking at window next to door. Two people, one boy, one girl. Alex [victim's husband] told him to do

a favor. Sat down on Rocking chair. Angel, the black guy went past the room. Angel and Patty [the victim] talk a little while. Patty went to room. Angel hit Patty in the back. Angel in room, guys next to couch. Guys blocking the way. Patty walking to room when she was stabbed. Living room light on. Someone carrying a little puppy. Patty went outside to get a dog. Kids were jumping in the bed. Black guy (Angel) was laughing when kids were jumping. Standing near the couch, girl 1st left. Angel fell asleep. I saw a real dragon. Black guy had jeans and shirt, had black hair like Alex. I saw Patty with dots on her face in the morning when I woke-up. Baby Alex was playing with her.

(*Id.* at 145-46.) Godoy's report was not disclosed to the defense prior to trial. (RT 11/10/88 at 3-5.)

Following Petitioner's conviction but prior to sentencing, Yolanda Lespron wrote a lengthy letter to the trial judge expressing her grief about the murder of her friend and providing some of Londie's recollections from the night of the crime. (Doc. 172-2 at 17-37.) In August 1988, after receiving a copy of the letter, a defense investigator contacted Yolanda and discovered that Londie had been interviewed by the prosecution prior to trial. (ROA-PCR at 148-166.) Yolanda told the investigator that her daughter initially was in shock following the murder and could not speak about it. Then about a year later, Londie saw Petitioner's picture in the newspaper and told her mother he was the man who had killed Patricia Pedrin. (*Id.* at 151, 155.) Yolanda also said her daughter recalled, among other things, Petitioner telling the victim her husband had sent him. (*Id.* at 150.)

The defense filed a motion for new trial, and the prosecution subsequently disclosed Godoy's report. (Doc. 172-2 at 4-10; RT 11/10/88 at 3-4.) Following a hearing, the trial court denied relief, observing that the witness had been available for interview prior to trial and concluding that Londie's statement was not exculpatory. (RT 11/10/88 at 18-19.) On appeal, the Arizona Supreme Court ruled:

> We hold that the judge did not abuse his discretion here. "The test for a *Brady* violation is whether the undisclosed material would have created a reasonable doubt had it been presented to the jury." *State v. Dumaine*, 162 Ariz. 392, 405, 783 P.2d 1184, 1197 (1989). The child's testimony would have indicated at most that others were at the scene of the crime, not that defendant did not commit it. Moreover, as noted by the trial judge, defendant never mentioned the presence of other persons in any of his statements to the authorities. Defendant flatly stated, "I did it, I done it, not a day goes by that I don't think about it."

- 20 -

The evidence overwhelmingly pointed to defendant's guilt. The trial court was in the best position to evaluate the potential effect that the child's purported testimony would have had upon the jurors. We find that the court did not err in denying defendant's motion to vacate judgment.

*Medrano I*, 173 Ariz. at 399, 844 P.2d at 566.

## B. Discussion

Under *Brady v. Maryland*, the government has a constitutional obligation to disclose information favorable to the defense. A successful *Brady* claim requires three findings: (1) the government willfully or inadvertently suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material to the issue of guilt or punishment. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *see Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Kyles v. Whitley*, 514 U.S. 419, 433 (1995). Evidence is material for *Brady* purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Here, it is undisputed that the prosecution failed to turn over Detective Godoy's report to Petitioner. (RT 11/10/88 at 12.) However, the Arizona Supreme Court found that the report not material. *Medrano I*, 173 Ariz. at 399, 844 P.2d at 566.

Petitioner argues that the Arizona Supreme Court's decision was contrary to *Brady* because the court applied too high a materiality standard.[6] (Doc. 131 at 40-41.) He contends the Arizona Supreme Court's applied standard—whether the undisclosed material would have created reasonable doubt had it been presented to the jury—is not faithful to the definition of materiality under *Brady*. (*Id.* at 41.) According to Petitioner, "he need not demonstrate that in light of the undisclosed evidence, there would not have been enough evidence for a conviction." (*Id.* at 41.)

---

[6] Petitioner also raises arguments concerning the trial court's ruling; however, the Arizona Supreme Court's opinion represents the "last reasoned decision" on this claim and is thus the applicable ruling for review under the AEDPA. *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

In *Kyles v. Whitley* the Court explained the materiality standard:

> *Bagley*'s touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, *understood as a trial resulting in a verdict worthy of confidence*. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

514 U.S. at 434 (emphasis added; citation omitted). The Arizona Supreme Court did not apply a different standard. The state court looked at whether the undisclosed material would have created reasonable doubt had it been presented to the jury; the court did not, as Petitioner argues, require that Petitioner show he would have been acquitted had the evidence been disclosed. By assessing whether the undisclosed evidence created reasonable doubt, the court necessarily considered whether the verdict was worthy of confidence, as a finding of reasonable doubt would undermine confidence in the verdict. *See United States v. Agurs*, 427 U.S. 97, 112 (1976) ("[I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. . . . If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial."). Therefore, the state's materiality standard was faithful, not contrary to, controlling federal law.

Petitioner appears to also argue that the Arizona Supreme Court unreasonably applied *Brady* in concluding that the undisclosed evidence was not material. (Doc. 131 at 34-42.) He contends information of others being in the house would have supported an innocence defense and would have been material to defense efforts to suppress his statements. (*Id.* at 36.) The Court disagrees.

Londie identified Petitioner as the person who stabbed Patricia Pedrin. Thus, her statement hardly supports an innocence defense. The contention that others might have been present in the house when Petitioner murdered the victim does not change the inculpatory nature of Londie's observations. Nor does this contention provide a basis to conclude that Petitioner's statements were coerced. As observed by the Arizona Supreme Court, the

evidence against Petitioner was substantial. In addition to confessing, Petitioner could not be excluded as the source of semen found on the victim's panties. (RT 7/12/88 at 121-34.) Patricia Pedrin's neighbor heard a honking car horn around 2:15 a.m. and saw a vehicle pull into Pedrin's driveway (corroborating Petitioner's statement that he used his car horn to summon the victim to her door). (*Id.* at 55-60.) The lights in Pedrin's home were out but an interior light came on after the male driver went to her door. (*Id.* at 62-63.) A short time later, he heard Pedrin's door slam and a vehicle speed away. (*Id.* at 60.) Sometime after 3:00 a.m. Petitioner ran into his girlfriend at a convenience store and told her he had blood on his hands. (RT 7/14/88 at 20.) A button found on the victim's bed corresponded to a button missing from the shirt Petitioner said he was wearing the night of the murder. (RT 7/12/88 at 92-93.) Shoe and tire prints from the victim's driveway were consistent with Petitioner's boots and vehicle. (*Id.* at 76-80, 84-85, 89, 106-10.) Any exculpatory value in Londie's reference to others being present at the home is marginal at best. Thus, the state court did not unreasonably conclude that the omitted evidence was not material.

Based on the record that was before the state court, this Court finds that Petitioner has not demonstrated under § 2254(d) that the state court's denial of his *Brady* claim was contrary to, or based on an unreasonable application of, controlling federal law. Accordingly, Petitioner is precluded from relief on Claim 4, and his requests for further evidentiary development are denied.

**IV.   Claim 14(A)(1) and 14(A)(5)**

In Claim 14(A)(1), Petitioner alleges that trial counsel was ineffective in failing to develop an innocence defense theory based on Londie Lespron's statement. (Doc. 30 at 31-32.) In Claim 14(A)(5), Petitioner further alleges that trial counsel was ineffective in failing to interview the children who were in the home at the time of the murder. (*Id.* at 32.) Although these claims were exhausted during state PCR proceedings, the state court found them to be procedurally precluded. In a previous order, the Court concluded that the state court's preclusion ruling did not rest on independent and adequate state grounds. (Doc. 119

at 16-18.) Consequently, Petitioner is entitled to *de novo* review of these claims because the state court did not adjudicate them on the merits. *See Menendez v. Terhune*, 422 F.3d 1012, 1026 (9th Cir. 2005).

The Court need not address counsel's performance if prejudice cannot be shown. To establish prejudice from deficient performance, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Petitioner contends that he was prejudiced by trial counsel's omissions because Londie's statements support an innocence defense. (Doc. 145 at 28.) However, the issue is not whether her statement supported other trial defenses but whether as a result of counsel not interviewing Londie or attempting to develop a different defense based on her statement, there is a reasonable probability the result of the proceeding would have been different. As discussed in Claim 4, the Court finds that the failure to interview Londie and develop a defense based on her potential testimony does not undermine confidence in the jury's verdict. Londie's statements in fact corroborate Petitioner's confessions of guilt, as she allegedly saw him stab the victim. Thus, even assuming the allegations as true, Petitioner cannot show prejudice from the failure to interview Londie before trial and is not entitled to evidentiary development of Claim 14(A)(1). *See Schriro v. Landrigan*, 550 U.S. at 474 ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.").

With respect to Claim 14(A)(5), Petitioner does not identify what information counsel would have obtained had he interviewed the victim's children. Conclusory allegations of ineffectiveness are insufficient to state a claim or obtain an evidentiary hearing. *See Williams v. Woodford*, 384 F.3d 567, 588 (9th Cir. 2004) ("[C]onclusory allegations by counsel that are unsworn and unsupported by any proof or offer of proof do not provide an adequate basis to obtain a federal evidentiary hearing."); *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994)

1
2
("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.").

3
**V.    Claim 14(B)(2)**

4
5
6
7
8
9
Petitioner contends that appellate counsel was ineffective for failing to raise on appeal a claim alleging trial counsel's ineffectiveness from the failure to obtain a DNA expert and independently examine crime scene evidence. (Doc. 30 at 33.) This claim was raised during state PCR proceedings but the state court did not reach a decision on the merits. (Doc. 119 at 18.) Consequently, Petitioner is entitled to *de novo* review. *Menendez*, 422 F.3d at 1025-26.

10
11
12
13
14
15
16
17
The Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). A claim of ineffective assistance of appellate counsel is reviewed under the standard set out in *Strickland*. *Miller v. Keeney*, 882 F.2d 1428, 1433-34 (9th Cir. 1989). A petitioner must show that counsel's appellate advocacy fell below an objective standard of reasonableness and there is a reasonable probability that, but for counsel's deficient performance, the petitioner would have prevailed on appeal. *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *Miller*, 882 F.2d at 1434 n.9 (citing *Strickland*, 466 U.S. at 688, 694).

18
19
20
21
22
23
24
Petitioner does not specifically identify the scientific evidence he alleges trial counsel should have had independently examined or identify the type of testing counsel should have undertaken. This lack of specificity demonstrates that appellate counsel was not ineffective for failing to urge such a claim on appeal. Petitioner also asserts that trial counsel should have enlisted a DNA expert but again does not identify what evidence should have been subjected to DNA testing and acknowledges that at the time of his trial "many modern DNA techniques were not available for the analysis of biological evidence." (Doc. 131 at 53.)

25
26
27
Petitioner argues that challenging the state's scientific evidence could have shown that his blood was not at the crime scene. (Doc. 131 at 53.) However, the only blood-related evidence admitted at trial was identified as consistent with the victim, not Petitioner. (RT

28

7/12/88 at 126.).  Petitioner also argues that scientific testing would have corroborated his claim that he "did not forcibly have sex with the victim through evidence of lack of bruising and/or force." (Doc. 145 at 29-30.)  However, the medical examiner testified that he found no trauma or injury to the victim's vaginal area, and defense counsel reiterated this point during closing argument.  (RT 7/13/88 at 39-40; RT 7/15/88 at 44-45.)  Petitioner does not explain what testing should have been undertaken to demonstrate lack of force.  Finally, the Court observes that the only incriminating scientific evidence admitted at trial related to semen found on the victim's panties.  A criminalist testified that Petitioner could not be excluded as the source of the semen.  (RT 7/12/88 at 126.)  However, Petitioner does not dispute that he had sex with the victim; instead, he claims the sex was consensual.  Therefore, it is unclear what would have been gained by additional testing of the semen, if that is the type of independent examination Petitioner contends should have been undertaken by trial counsel.

Given the speculative and conclusory nature of Petitioner's allegations of ineffectiveness against trial counsel regarding the failure to enlist a DNA expert and conduct independent scientific testing, the Court finds that appellate counsel's failure to raise such claims did not fall below an objective standard of reasonableness for appellate advocacy. Furthermore, because the facts as alleged do not demonstrate a colorable claim for federal habeas relief, Petitioner is not entitled to further develop evidence in support of this claim. *Williams*, 384 F.3d at 588.

## CONCLUSION

The Court concludes that Petitioner is not entitled to federal habeas relief on his conviction-related claims.  The Court further finds that an evidentiary hearing is neither warranted nor required with respect to these claims.

## CERTIFICATE OF APPEALABILITY

Rule 22(b) of the Federal Rules of Appellate Procedure provides that an applicant cannot take an appeal unless a certificate of appealability has been issued by an appropriate

judicial officer. Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district judge must either issue or deny a certificate of appealability when it enters a final order adverse to the applicant. If a certificate is issued, the court must state the specific issue or issues that satisfy 28 U.S.C. § 2253(c)(2). Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

Although this is not a final order, the Court has determined that reasonable jurists could not debate its resolution of Petitioner's conviction-related claims. Accordingly, when final judgment is entered in this case, the Court does not intend to issue a COA on any of the issues addressed herein.

Based on the foregoing,

**IT IS HEREBY ORDERED** that Claims 1, 2, 4, 14(A)(1), 14(A)(2), 14(A)(5), and 14(B)(2) of Petitioner's First Amended Petition for Writ of Habeas Corpus (Doc. 30) are **DENIED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that any party seeking reconsideration of this order pursuant to LRCiv 7.2(g) shall do so no later than fifteen (15) days after the filing of this order.

**IT IS FURTHER ORDERED** that Petitioner's sentencing-related claims remain stayed pending further order of the Court.

**IT IS FURTHER ORDERED** that the Clerk of Court substitute Charles L. Ryan, Director of the Arizona Department of Corrections, for Dora Schriro as a party to this matter, pursuant to Fed. R. Civ. P. 25(d)(1).

**IT IS FURTHER ORDERED** that the Clerk of Court send a courtesy copy of this

Order to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

DATED this 1st day of March, 2012.

Cindy K. Jorgenson
United States District Judge